IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BRYAN GAINES, in his individual<br>capacity and Personal Representative<br>of the Estate of EMILY GAINES, *et al.*, | )<br>)<br>)<br>) | |
| Plaintiffs, | ) | Case No. CIV-20-851-D |
| v. | )<br>) | |
| CITY OF MOORE, a municipal<br>Corporation, *et al.*, | )<br>)<br>) | |
| Defendants. | )<br>) | |

## ORDER

Before the Court is Defendant City of Moore's (the "City") Motion for Summary Judgment [Doc. No. 131]. Defendant Kyle Lloyd [Doc. No. 138] and Plaintiffs [Doc. No. 139] each filed a response in opposition, to which the City replied [Doc. No. 140]. The matter is fully briefed and at issue.

## BACKGROUND

This case stems from a fatal car accident. On the morning of December 14, 2019, Kyle Lloyd, a former Moore police officer, was at home, off-duty, when he received a phone call from an on-duty Moore police officer, Kyle Wagner. The City's police force was conducting its annual Shop With a Cop event, and Officer Wagner, who was participating in the event, accidentally locked the keys in the police car he was using. Officer Wagner asked Mr. Lloyd to bring a spare key and asked that he hurry. Mr. Lloyd left his home in his personal vehicle. Unfortunately, and tragically, Mr. Lloyd collided with a vehicle driven

by Emily Gaines, who was on her way to take the ACT college admission exam. Ms. Gaines died at the scene of the accident.

Plaintiffs Bryan and Dana Gaines originally filed suit against the City, Chief Todd Strickland, Chief Jerry Stillings, Chief Todd Gibson, and Mr. Lloyd in Cleveland County, Oklahoma District Court.[1] The case was removed to the Western District of Oklahoma, and, after an initial motion to dismiss and subsequent amended complaint, the City, Chief Strickland, Chief Stillings, and Chief Gibson filed a second motion to dismiss (Mr. Lloyd did not join in the motion).

On June 3, 2022, the Court dismissed Plaintiffs' claims against Chief Strickland, Chief Stillings, and Chief Gibson. *See* 6/3/2022 Order [Doc. No. 41]. As for the City, the Court held that Plaintiffs failed to "state a plausible municipal liability claim on the basis of formal policies or widespread customs" or "the basis of a deliberately indifferent failure to train." *Id.* at 6-7, 9-10.[2] However, the Court held that Plaintiffs' municipal-liability claim "based on the City's deliberately indifferent failure to supervise . . . is the only plausible basis for Plaintiffs' municipal liability claim." *Id.* at 11. The Court likewise declined to dismiss Plaintiffs' state-law claim under the Oklahoma Governmental Tort Claims Act ("GTCA"). *Id.* at 14-15.

---

[1] As Plaintiffs allege in the second amended complaint, Todd Strickland and Jerry Stillings were each Chiefs of Police during a time period relevant to this case, and Todd Gibson is the current Chief of Police. For purposes of this Order, and to provide clarity on their role during the relevant time period, the Court will refer to each individual as "Chief."

[2] The Court also dismissed Plaintiffs' claim against the City for negligent hiring, training, supervision, and retention. 6/3/2022 Order at 11.

Upon the close of discovery, the City filed the instant Motion, in which it argues it is entitled to summary judgment on Plaintiffs' § 1983 municipal-liability claim, as well as their claim under the GTCA.

## UNDISPUTED MATERIAL FACTS[3]

### I.    Mr. Lloyd's field training and driving history while employed by the City

#### A.    Field training

In 2006, Mr. Lloyd began working for the City[4] as a police officer. City's Lloyd Depo. [Doc. No. 131-2] at 8.[5] He was 21 years old, and it was his first job in law enforcement. Pls.' Lloyd Depo. [Doc. No. 139-1] at 2. After being hired, Mr. Lloyd underwent four months of field training. As part of Mr. Lloyd's field training, an MPD field training officer ("FTO") completed assessments, each of which included scores assigned to various areas of Mr. Lloyd's performance. One of Mr. Lloyd's assessments is set forth below, for reference:

---

[3] This statement includes material facts that are supported by the record and not opposed in the manner required by Fed. R. Civ. P. 56(c)(1) and LCvR56.1(d). All facts properly presented by a party and not specifically controverted by an opponent are deemed admitted, pursuant to Fed. R. Civ. P. 56(e)(2) and LCvR56.1(e).

[4] The Court refers to both the "City" and "MPD" in this Order. However, any reference to "MPD" should also be understood as a reference to the City.

[5] Citations to the parties' filings, including exhibits, reference the Court's CM/ECF pagination at the top of each page. Relatedly, certain of the parties' exhibits are the same, though they attach and rely on different portions of the relevant document. For example, both parties attach portions of Mr. Lloyd's deposition transcript as an exhibit. Because of this, along with the large number of individuals deposed in this case, the Court will initially include the CM/ECF document number when citing to exhibits. Subsequent citations will reference either "Pls.'" or "City's" so it is clear what the Court is citing.

**Moore Police Department**
*Field training program*

Date _12-14-06 (Thurs)_    Report #_20_

- Recruit Name & Badge # _Officer K. Lloyd #286_
- FTO Name & Badge # _MPO Toles #224_

Shift assignment _ADAM_                Phase_1_

Available ratings for current standing in the program based on the Standard Evaluation Guidelines:

| Rating scale | | |
|---|---|---|
| 1-2 | Unacceptable | N/O | Not observed |
| 3-4-5 | Acceptable | NRT | Not responding to training |
| 6-7 | Superior | RTT | Remedial training time |

(RTT required for a rating of 1-2 or NRT)

**ATTITUDE**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1) Acceptance of Feedback | (5) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| 2) General Appearance | (2) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| 3) Professional Standards | (4) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |

**KNOWLEDGE**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4) Geography | (4) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| 5) Laws and Ordinances | ( ) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| 6) Policies and Procedures | ( ) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| 7) Resources and Alternatives | (3) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |

**PERFORMANCE**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8) Decision Making | (4) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| 9) Driving Skills | (2) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| 10) Officer Safety | (4) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| 11) Field Performance / Stress | ( ) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| 12) Traffic Enforcement | ( ) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| 13) Use of Equipment | (4) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |

**COMMUNICATION**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 14) Electronic Communication | (4) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| 15) Interpersonal Communication | (6) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| 16) Procedural Communication | (4) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| 17) Report Writing (Content) | ( ) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| 18) Report Writing | ( ) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| (Spelling, Grammar, & Neatness) | | | | | | | | | | | |

**SELF-INITIATED FIELD ACTIVITY**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 19) Investigative/Interview skills | (4) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| 20) Problem Solving | (3) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |
| 21) Recognition of Work (beats) | (4) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | N/O | NRT | RTT ____ |

City's 12/14/2016 Field Training Assessment [Doc. No. 131-1]. The assessments also included a section where the FTO could provide written feedback on the trainee's performance. *See id.*

During his field training in 2006 and 2007, Mr. Lloyd received numerous "unacceptable" ratings and relevant comments from his FTOs:

- Mr. Lloyd received an "unacceptable" rating in the area of "Officer Safety." Pls.' Lloyd FTO Assessments [Doc. No. 139-4] at 1.

- Mr. Lloyd received an "unacceptable" rating in the area of "Decision Making." *Id.* at 2.

- Mr. Lloyd received an "unacceptable" rating in the areas of "General Appearance" and "Driving Skills." *Id.* at 4. Mr. Lloyd's FTO noted that Mr. Lloyd "failed to maintain control of the patrol vehicle while turning right and the result was the passenger side rear tire striking the curb, and at Main & Classen [Mr. Lloyd] made an improper right turn." *Id.* at 5.

4

- Mr. Lloyd's FTO noted that Mr. Lloyd "demonstrated a lack of alertness of vehicles in front of him." *Id.* at 7.

- Mr. Lloyd's FTO noted that Mr. Lloyd "hit a curb while making a right turn." *Id.* at 8.

- Mr. Lloyd's FTO noted that, while "responding to back another officer who was involved in a pursuit," Mr. Lloyd "did not realize there was a raised area in the intersection and traveled over it a bit too fast." City's Lloyd FTO Assessments [Doc. No. 131-5] at 3.

- Mr. Lloyd's FTO noted that, during a "couple of traffic stops," Mr. Lloyd "stopped too close to the vehicle and did not position the patrol unit in a manner to protect himself from passing vehicles." Pls.' Lloyd FTO Assessments at 10.

- Mr. Lloyd's FTO noted that, while initiating a traffic stop, Mr. Lloyd "managed to avoid a wreck, but it was close." *Id.* at 12.

- Mr. Lloyd received an "unacceptable" rating in the area of "Use of Equipment." *Id.* at 13. Mr. Lloyd's FTO noted that Mr. Lloyd "sometimes traveled too fast through parking lots not taking into consideration that a pedestrian could be near." *Id.* at 14. It was also noted that Mr. Lloyd "attempted to place the patrol car into the park position, before the patrol [car] came to a complete stop." *Id.*

- In a section entitled "Significant Weaknesses," Mr. Lloyd's FTO noted that Mr. Lloyd "sometimes [drives] too fast through parking lots under normal conditions." City's Lloyd Transition Review [Doc. No. 131-8] at 2.

### B.    On-duty vehicle accidents

Ultimately, Mr. Lloyd completed his field training and began work as a full-time officer for MPD. During his time on-duty as an officer, but before the accident resulting in Ms. Gaines's death, Mr. Lloyd was involved in two vehicle accidents:

- In 2006 or 2007, Mr. Lloyd was involved in an on-duty fleet vehicle accident where he was at fault. City's Lloyd Depo. at 7-8. Mr. Lloyd described the accident as "no injuries" and "minor damage rear-ending." *Id.* at 8. Mr. Lloyd reported the accident to his immediate supervisor, Lt. James Fagan, and the

City performed an investigation and issued Mr. Lloyd a letter of counseling. *Id.* at 8-9.

- On May 15, 2009, Mr. Lloyd was involved in an on-duty fleet vehicle accident. *Id.* at 10. An elderly woman failed to stop at a stop sign and drove in front of Mr. Lloyd, who collided with the woman's vehicle. *Id.* The City investigated the accident and determined that Mr. Lloyd was not at fault. *Id.*; *see also* City's Collision Report [Doc. No. 131-3] at 4.

## C.    Sooner Road traffic stop

Several years before the accident resulting in Ms. Gaines's death, Mr. Lloyd, while off-duty and in his personal vehicle, was pulled over by Oklahoma City police officer Dave Roberts for speeding on Sooner Road (the "Sooner Road traffic stop"). It is unclear precisely how fast Mr. Lloyd was driving when he was pulled over. Mr. Lloyd testified that he was not sure how fast he was driving, and in his discovery responses he states that he does not recall ever being stopped for speeding over 90 mph. City's Lloyd Depo. at 11-12; City's Lloyd Disc. Resp. [Doc. No. 131-9] at 3. In his Affidavit, Officer Roberts states that Mr. Lloyd was driving "well over 100 mph." Pls.' Roberts Aff. [Doc. No. 139-11].[6] Officer Roberts did not issue Mr. Lloyd a citation, and he did not report the Sooner Road traffic stop to anyone until the 2021 sentencing hearing in Mr. Lloyd's criminal case. *Id.*; City's Roberts Depo. [Doc. No. 131-13] at 3.

---

[6] Construing the evidence in Plaintiffs' favor, as is required at the summary-judgment stage, the Court adopts Officer Roberts' recollection of Mr. Lloyd's speed during the Sooner Road traffic stop. Therefore, when necessary, the Court will use Officer Roberts' own language and state that the Sooner Road traffic stop was the result of Mr. Lloyd driving "well over 100 mph."

## II.    The City's Disciplinary Matrix and retention of disciplinary records

### A.    Disciplinary Matrix

During the time period relevant here, the City had an official Disciplinary Matrix. Under the Disciplinary Matrix, no disciplinary action is taken by the City for an officer's first two documented instances of speeding. Pls.' Toles Depo. [Doc. No. 139-6] at 4-5; Pls.' Strickland Depo. [Doc. No. 139-10] at 24. Additionally, the Disciplinary Matrix allows officers to incur nine speeding offenses in a one-year period before any disciplinary action is taken by the City. Pls.' Toles Depo. at 7. The Disciplinary Matrix also allows officers to incur twenty-seven speeding offenses in a two-year period before receiving a Category B violation. *Id.* at 9.

The Disciplinary Matrix further allows officers to be involved in nine vehicle accidents in a one-year period before receiving discipline, and officers could be involved in twenty-seven vehicle accidents in a two-year period before receiving discipline. *Id.* at 10-11. There is no evidence in the record that the City ever applied the Disciplinary Matrix—either as to Mr. Lloyd or any other officer—in the theoretical manner described above, and Plaintiffs' retained expert, Michael D. Lyman, Ph.D., could not identify any evidence showing that the City applied the Disciplinary Matrix in this manner. Lyman Depo. [Doc. No. 130-1] at 11-12.

### B.    Retention of disciplinary records

The City permits officers, without approval from a superior, to remove past disciplinary records from their file if the record is more than two years old, and there have not been any other disciplinary incidents within that two-year period. Pls.' Jolly Depo.

[Doc. No. 139-9] at 5-6. MPD officers do not remove the files on their own; instead, officers make the request through Christine Jolly, MPD's Human Resources Director, who then ensures the document meets certain qualifications before being removed. *Id.*

Two days after the accident resulting in Ms. Gaines's death, Mr. Lloyd asked Ms. Jolly to remove from his file a letter of reprimand stemming from a "horseplay incident" that occurred in 2011. *Id.* at 2, 17-18; Pls.' Lloyd Depo. at 55-56. This was the only time Mr. Lloyd asked Ms. Jolly to remove a disciplinary record from his file. Pls.' Jolly Depo. at 3; Pls.' Lloyd Depo. at 55-57.

### III. Mr. Lloyd's December 14, 2019 accident with Ms. Gaines

On December 14, 2019, the City hosted its annual "Shop With a Cop" event. Pls.' Pls.' Stillings Depo. [Doc. No. 139-8] at 21. The event's purpose was to improve and maintain good community relations, build the community's trust in law enforcement, and foster cooperation with law enforcement. Pls.' Peck Depo. [Doc. No. 139-7] at 14; Pls.' Lloyd Depo. at 7-10. It was important to the City that the event run smoothly and that MPD looked good to the community. Pls.' Lloyd Depo. at 12. As such, MPD required participating officers to drive the newer, better-looking SUV patrol vehicles—one of which was assigned to Mr. Lloyd—instead of the older Crown Victoria vehicles. *Id.* at 10-11. Although Mr. Lloyd was not participating in the event, MPD requested he give up his newer SUV patrol vehicle to another officer who was participating, Officer Kyle Wagner. *Id.*; Pls.' Wagner Depo. [Doc. No. 139-19] at 4.

As the Shop With a Cop event was set to begin, Officer Wagner accidentally locked the keys in the SUV patrol vehicle he was borrowing from Mr. Lloyd. Pls.' Wagner Depo.

at 7-8; Pls.' Lloyd Depo. at 12-13. Officer Wagner called Mr. Lloyd—who was the only person with a spare key—and asked him to bring the spare. Pls.' Lloyd Depo. at 12-13. Officer Wagner told Mr. Lloyd to hurry, as the event was about to begin. *Id.* at 14-16.

After receiving Officer Wagner's call, Mr. Lloyd got into his personal vehicle and drove toward where Officer Wagner was located. Driving south on Sooner Road, and as he approached the intersection at South Sooner Road and S.E. 134th Street, Mr. Lloyd accelerated in order to avoid stopping at a potential red light. *Id.* at 30, 35. As Mr. Lloyd neared the intersection, Ms. Gaines—who was driving north on Sooner Road—attempted to turn left onto 134th Street. Pls.' Police Incident Report [Doc. No. 139-21] at 7. Mr. Lloyd applied his brakes, but he was unable to stop before colliding with the passenger side of Ms. Gaines's vehicle. At the time he applied his brakes, Mr. Lloyd was traveling 92 mph. *Id.* As a result of the collision, Ms. Gaines died at the scene. *Id.* at 8.

## STANDARD OF DECISION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the facts and evidence are such that a reasonable jury could return a verdict for the nonmoving party. *Id.* All facts and reasonable inferences must be viewed in the light most favorable to the non-movant. *Id.* at 255.

A movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986). If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); *see also* Fed. R. Civ. P. 56(c)(1)(A). The inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## DISCUSSION

As explained above, two claims against the City remain at issue. First, Plaintiffs assert a § 1983 municipal-liability claim based on the City's alleged deliberately indifferent supervision and discipline of Mr. Lloyd. Second, Plaintiffs assert a state-law claim under the GTCA, alleging vicarious liability based on Mr. Lloyd's negligent operation of his vehicle while in the scope of his employment with the City. For the reasons set forth below, the Court finds that the City is entitled to summary judgment on Plaintiffs' § 1983 claim, but not Plaintiffs' state-law claim under the GTCA.

## I.    The City is entitled to summary judgment on Plaintiffs' § 1983 claim.

To prevail on their § 1983 municipal-liability claim, Plaintiffs must show: "(1) a municipality enacted or maintained a policy, (2) the municipality was deliberately indifferent to the resulting constitutional violations, and (3) the policy caused the underlying constitutional violation." *Arnold v. City of Olathe*, 35 F.4th 778, 795 (10th Cir.

2022); *see also Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (describing the three elements of a § 1983 municipal-liability claim as "(1) official policy or custom, (2) causation, and (3) state of mind"). "A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Schneider*, 717 F.3d at 770.

### A.    The City did not act with deliberate indifference.

"A city's failure to train or failure to supervise its employees constitutes an official policy or custom when it 'amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact.'" *Parker v. City of Tulsa*, No. 16–CV–0134–CVE–TLW, 2017 WL 1397955, at *3 (N.D. Okla. Apr. 18, 2017) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Deliberate indifference is a stringent standard of proof, as described in *Bryson v. City of Oklahoma City*:

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

627 F.3d 784, 789 (10th Cir. 2010) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998)).

Here, the Court previously held that Plaintiffs' municipal-liability claim survived dismissal based on the City's alleged deliberately indifferent supervision and discipline of Mr. Lloyd. *See* 6/3/2022 Order. Because Plaintiffs do not allege a pattern of tortious conduct, they must establish notice by showing that the need for more or different supervision of Mr. Lloyd "was so obvious that a violation of [Ms. Gaines's] constitutional right[s] . . . was likely to result from not providing it." *Parker*, 2017 WL 1397955, at *4.

To establish notice and, in turn, the City's deliberate indifference, Plaintiffs rely on the following (all of which is set forth in detail above in the Court's recitation of undisputed material facts):

- Mr. Lloyd's "numerous unacceptable or barely acceptable ratings in driving skills and related skillsets" during his field training, as well as "numerous comments from FTO trainers showing (and putting M.P.D. on notice of) a pattern of unsafe driving and poor decision making." Pls.' Resp. at 23-24.

- Mr. Lloyd's two previous, on-duty motor-vehicle accidents. *Id.* at 12, 25.

- The Sooner Road traffic stop. *Id.* at 25.

- The City's alleged practice of allowing officers, including Mr. Lloyd, to "purge" their disciplinary records. *Id.* at 25-26.

- The City's allegedly deficient Disciplinary Matrix. *Id.* at 27-28.

All of the above, Plaintiffs argue, shows that the City "not only had notice that Lloyd had prior violations and red flags, but specifically that Lloyd had prior speeding violations, unsafe driving incidents, and collisions – including speeding over 120 mph on the very same road where he would ultimately kill Emily Gaines." *Id.* at 29. Despite having notice, however, Plaintiffs contend the City "completely disregarded this notice; and explicitly memorialized its tolerance of Lloyd's (and other officer's) unsafe [] driving habits by

creating a disciplinary matrix intentionally designed not [to] punish officers, like Lloyd, for repeated traffic violations and unsafe driving." *Id.* at 29-30. Therefore, Plaintiffs argue, "a jury could conclude that the City knew of Lloyd's dangerous driving and ignored the obvious potential for harm to citizens that it created, and that the City's policies, training and supervision of Lloyd was the moving force behind his decision to recklessly speed on December 14, 2019, taking the life of Emily Gaines." *Id.* at 30.

The City, on the other hand, argues Mr. Lloyd's "disciplinary and training records in no way put the City on notice, either actual or constructive, that his operation of a motor vehicle was 'substantially certain' to cause death or serious harm to an innocent civilian." City Mot. Summ. J. at 11. As for the Sooner Road traffic stop, the City argues there is no evidence that Chief Stillings—as the City's "policy-maker tasked with supervising and disciplining [City] officers during the relevant portion of Lloyd's employment"—was ever aware of the incident before Ms. Gaines's death. *Id.* at 16-18, 16 n.3. The City also claims that evidence indicating that Mr. Lloyd told Lieutenant Matthew Peck of the incident is irrelevant because Lt. Peck was not Mr. Lloyd's supervisor. *Id.* at 18-19.

Recall, Plaintiffs must present sufficient evidence to support a finding that a violation of constitutional rights was a highly predictable or plainly obvious consequence of the City's failure to supervise or discipline Mr. Lloyd. The Court first addresses Mr. Lloyd's field training and driving history before Ms. Gaines's death, including the Sooner Road traffic stop. The Court then addresses the alleged practice of allowing officers to "purge" their disciplinary records, as well as the City's Disciplinary Matrix.

### 1.     Mr. Lloyd's field training and driving history

Aside from the Sooner Road traffic stop, Plaintiffs rely on Mr. Lloyd's documented field training and on-duty driving history while employed by the City, as set forth in detail above. However, each of Mr. Lloyd's documented incidents were relatively minor in nature. Perhaps the most serious incident—a collision with an elderly woman—was not Mr. Lloyd's fault. And the other incidents—a minor fender bender and Mr. Lloyd's FTO assessments—in no way make it highly predictable or plainly obvious that Mr. Lloyd would make the irrational and tragic decision that led to Ms. Gaines losing her life. These incidents do not present "an obvious potential for constitutional violations," and, therefore, do not support a finding of deliberate indifference. *See Bryson*, 627 F.3d at 789.[7]

The Sooner Road traffic stop is a closer call. It must first be noted that there is a lack of clarity regarding whether Mr. Lloyd reported the incident to any of his superiors and, if he did, whether those superiors reported the incident up the chain of command. When asked whether he reported the Sooner Road traffic stop, Mr. Lloyd testified that he was "sure [he] did" report it to his supervisors and that he "[m]aybe" told Lt. Peck. Pls.' Lloyd Depo. at

---

[7] As noted above, Mr. Lloyd's field training and on-duty driving history include incidents that can only be described as minor. But another (perhaps obvious) point is worth noting, at least as it relates to Mr. Lloyd's field training. Mr. Lloyd's field training occurred under the watchful eye of an FTO, whose job it was to observe and critique each perceived instance of subpar performance by Mr. Lloyd. It appears the point of field training—as with nearly any on-the-job training—was to point out, and later correct, certain skills or practices that Mr. Lloyd might need to improve. In the Court's view, candid, well-documented, and transparent training of police recruits ought to be encouraged for at least two reasons: (1) to identify and potentially remove unqualified recruits; and (2) to identify weak spots for qualified recruits so that they are aware of those weaknesses and may better serve the community upon the completion of training. It seems counterintuitive to encourage such training, only to later rely on critiques levied during said training in potentially subjecting a municipality to § 1983 liability based on a failure-to-supervise theory. That is not to say that it would be improper in each and every case, but the Court finds that it is here.

61. But Lt. Peck testified that he could not recall Mr. Lloyd reporting the Sooner Road traffic stop and, if Mr. Lloyd had, he would have reported it to his captain. City's Peck Depo. [Doc. No. 131-10] at 3-4. And there is no evidence before the Court showing that Chief Stillings—or any other MPD chief for that matter—was made aware of the Sooner Road traffic stop *before Ms. Gaines's death*. Indeed, Chief Stillings testified that he became aware of the Sooner Road traffic stop after Ms. Gaines's death, but that he "did not know about that when it occurred." City's Stillings Depo. [Doc. No. 131-12] at 3.

Although the evidence suggests Mr. Lloyd's superiors were not aware of the Sooner Road traffic stop before Ms. Gaines's death, it is less than clear. Due to this lack of clarity, the Court—as is required at the summary-judgment stage—will construe the evidence in favor of Plaintiffs as the non-movant. And perhaps going further, the Court will assume that: (1) Mr. Lloyd reported the Sooner Road traffic stop to Lt. Peck and (2) Lt. Peck reported the Sooner Road traffic stop up the chain of command to Chief Stillings. But even when the evidence is so construed—or assumed—Plaintiffs still fall short of producing sufficient evidence of deliberate indifference. On this front, the Court agrees with the City that *Pigeon v. City of Okla. City*, No. 22-6033, 2022 WL 17660539 (10th Cir. Dec. 14, 2022) is particularly instructive.[8]

In *Pigeon*, an Oklahoma City police officer, Keith Sweeney, "responded to Dustin Pigeon's mental health crisis by storming onto the scene and gunning him down without determining if he posed a threat to others or consulting with other officers who had already

---

[8] The Court acknowledges the unpublished nature of *Pigeon*. However, due to the similarities described in detail above, the Court finds the panel's reasoning particularly persuasive.

engaged Mr. Pigeon." *Id.* at *1. Mr. Pigeon's mother sued Oklahoma City and its former police chief, William Citty, under § 1983 for Chief Citty's "alleged failure to properly supervise Officer Sweeney." *Id.* The district court granted summary judgment to Oklahoma City and Chief Citty on the plaintiff's § 1983 claim because she "failed to produce evidence showing Officer Sweeney's prior misconduct would have alerted Chief Citty that Officer Sweeney almost inevitably would have used excessive force against Mr. Pigeon." *Id.*

On appeal, the Tenth Circuit first recounted Officer Sweeney's disciplinary history since the time he was hired by Oklahoma City as a police officer in 2008:

- In June 2011, the department gave Officer Sweeney verbal counseling and remedial training after he used force to prevent a suspect from swallowing baggies of what Officer Sweeney believed to be cocaine;

- In October 2011, the department gave Officer Sweeney verbal counseling after he used profanity on the job;

- In November 2011, the department gave Officer Sweeney verbal counseling after he failed to make a police report concerning possible child abuse reported to him telephonically and added his personal opinions to the call dispositions;

- In October 2014, the department reprimanded Officer Sweeney for failing to comply with department procedures regarding barricaded mental patients after he barged into a home to tase an armed and suicidal woman;

- In February 2015, the department gave Officer Sweeney post-incident training on the proper positioning and use of police vehicles for cover after Officer Sweeney and another officer shot and killed a man who drove his car at the other officer;

- In 2016, the department reprimanded Officer Sweeney for failing to properly book seized evidence into the property room, failing to document a meeting that took place outside of work hours, failing to work scheduled 8-hour shifts, and changing his work schedule without supervisor approval;

- In March 2017, the department reprimanded Officer Sweeney for using his police position to obtain confidential information regarding a case assigned to the Department of Human Services;

- In March 2017, the department placed Officer Sweeney on administrative leave while it looked into Officer Sweeney's investigative practices; and

- After Office[r] Sweeney used profanity while making an arrest in November 2017, the department ordered him to undergo remedial training on language usage.

*Id.* at *1-2. The court observed that the above-referenced October 2014 and February 2015 "incidents involving Officer Sweeney's use of force are especially noteworthy." *Id.* at *2. In each incident, Officer Sweeney responded to an ongoing, volatile situation and, at least in the police department's view, failed to act appropriately. *Id.* Importantly, each incident involved Officer Sweeney's use of force. *Id.*

After setting forth the applicable legal standard governing the plaintiff's § 1983 municipal-liability claim—the same standard governing Plaintiffs' claim here—the court reasoned as follows:

> We agree with the district court that Ms. Pigeon failed to produce sufficient evidence of deliberate indifference to survive summary judgment. Ms. Pigeon does not point to any prior incident where Officer Sweeney violated a person's constitutional rights through the use of excessive force. Nor does Ms. Pigeon point to any evidence establishing a high predictability or near inevitability that Officer Sweeney would use excessive force when he had not done so in the past. Indeed, Ms. Pigeon does not challenge the district court's conclusion that "[t]he majority of [Officer] Sweeney's prior policy violations and misconduct do not relate in any way to the use of force and thus would not have alerted [Chief] Citty to any risk of constitutional harm of the type experienced by Mr. Pigeon." And even in the incident where Officer Sweeney used a taser on a mentally disturbed person in violation of established procedures, Ms. Pigeon has not produced any evidence establishing that Officer Sweeney's use of force was "excessive" or that Officer Sweeney otherwise violated that person's constitutional rights.

*Id.* at *4 (internal footnote and citation omitted). The court, therefore, affirmed the district court's grant of summary judgment.[9]

The Court also finds *Est. of Smith v. Silvas*, 414 F. Supp. 2d 1015 (D. Colo. 2006) instructive. In *Silvas*, a Denver police officer, Robert Silvas, responded to a 911 call stemming from a domestic dispute involving Regina Keith and her son, Gregory Lee Smith. *Id.* at 1017. Although the parties' accounts differed as to the threat he actually posed, Mr. Smith ultimately wielded a knife and took at least one step up a stairwell toward Officer Silvas and another officer, Jim Turney. *Id.* The officers shot and killed Mr. Smith. *Id.* Relevant here, Mr. Smith's estate sued the city of Denver, as well as Officers Turney and Silvas, and asserted § 1983 "failure to train and/or supervise [municipal-liability] claims" against the city. *Id.* The city moved for summary judgment on the estate's municipal-liability claims. *Id.*

At the outset of its analysis, the *Silvas* court framed the issue as follows: "whether the City had notice that its actions or inactions will likely result in the constitutional violation, namely an unconstitutional or improper shooting, not simply a shooting." *Id.* at 1020. The court then recounted Officer Silvas's "extensive history of incidents involving guns," which included numerous instances in which he shot and killed individuals. *Id.* Taking Officer Silvas's extensive history into account, the court noted it was undisputed

---

[9] Although the district court in *Pigeon* granted summary judgment to Oklahoma City based on the actions of Chief Citty, the Tenth Circuit held that, because the same standard governed the plaintiff's claims against Chief Citty and Oklahoma City and because the plaintiff "failed to establish deliberate indifference on Chief Citty's part, her § 1983 claim against Oklahoma City necessarily fails." *Pigeon*, 2022 WL 17660539, at *4.

that the city "has institutional knowledge of Silvas's history of at least eight shootings, resulting in five deaths, in four separate events, as well as a record of threats and abuse." *Id.* at 1021. Nonetheless, the court found that the estate failed to meet the stringent proof requirements for imposing municipal liability:

> [I]t is also undisputed that: (1) no shooting was ever found to be improper; (2) Silvas was disciplined; (3) he was required to take additional training concerning the use of firearms; (4) he had a history of commendable restraint in the face of two serious threats; and (5) several years had passed since his last discharge of a firearm.
>
> ***
>
> The Tenth Circuit has restated the deliberate indifference standard of *City of Canton* to require a showing that "the municipality has actual or constructive notice that its action or failure to act is *substantially certain* to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." The issue can thus be restated: did the City of Denver have notice that its failure to further supervise was substantially certain to result in an unconstitutional shooting and choose to consciously or deliberately disregard that risk?
>
> Certainly a reasonable jury could conclude from Officer Silvas's history of shooting (and killing) individuals in the course of his police service that the City had notice that he may use deadly force. Beyond that, however, can a reasonable juror infer that the City had notice that Silvas's use of force would be so excessive as to be unconstitutional? There is no evidence that he ever improperly fired his weapon. Further, considering the discipline imposed, additional training required, and the significant temporal separation from the last shooting involving Officer Silvas, evidence is lacking to show a "direct causal link" between the shooting and inadequate supervision. I find that, considering the evidence as a whole and drawing all reasonable inferences in favor of the Estate, the City did not have notice that it was substantially certain that a constitutional violation would occur.

*Id.* (internal citation omitted) (emphasis in original).

Here, as in *Pigeon*, Plaintiffs point to no prior incident where Mr. Lloyd violated someone's constitutional rights through excessive speeding or the failure to abide by traffic

laws while off-duty (or while on-duty, for that matter). As explained above, Mr. Lloyd's field training and on-duty driving history include minor incidents that occurred approximately 10 years (or more) before the accident resulting in Ms. Gaines's death. Even considering the Sooner Road traffic stop—and, again, assuming Mr. Lloyd reported the incident to Lt. Peck and Lt. Peck reported it up the chain of command to Chief Stillings— Mr. Lloyd's relevant history is markedly different than Officer Sweeney's in *Pigeon*. Officer Sweeney had multiple, on-duty, documented incidents of inappropriate conduct in situations similar to the incident in which he killed Mr. Pigeon. Even so, "[t]he majority of [Officer] Sweeney's prior policy violations and misconduct do not relate in any way to the use of force and thus would not have alerted [Chief] Citty to any risk of constitutional harm of the type experienced by Mr. Pigeon." *Pigeon*, 2022 WL 17660539 at *4 (alterations in original). The same is true of Mr. Lloyd's field training and driving history here.

And as in *Silvas*, even assuming the City had full knowledge of Mr. Lloyd's field training and on-duty driving history, as well as the Sooner Road traffic stop, Plaintiffs fail to present sufficient evidence that the City had "notice that its failure to further supervise was substantially certain to result in" a violation of constitutional rights. 414 F. Supp. 2d at 1021. Perhaps a reasonable jury could conclude from Mr. Lloyd's history that the City had notice that he may speed or otherwise ignore traffic laws (though even that seems specious). "Beyond that, however, can a reasonable juror infer that the City had notice that [Mr. Lloyd's speeding and ignoring traffic laws] would be so excessive as to be

unconstitutional?" *Id.* As in *Silvas*, the Court finds that Plaintiffs have failed to present sufficient evidence supporting such an inference.[10]

### 2. Allowing officers to "purge" their disciplinary records

Plaintiffs take issue with the City permitting officers to remove prior disciplinary records from their files without any approval from a superior. *See* Pls.' Resp. at 25-26. Plaintiffs contend such a practice "creates a situation whereby unsafe officers remain on the street potentially creating a safety hazard to the public." Pls.' UMF 26. Maybe so, but, as made clear in the Court's prior motion to dismiss order, this is not a case involving a formally promulgated policy or a well-settled custom or practice. Therefore, it is unclear to the Court how the City's policy makes it highly predictable or plainly obvious that its failure to supervise or discipline Mr. Lloyd would lead to a violation of constitutional rights, especially when the only documented instance of Mr. Lloyd having a disciplinary file removed from his record occurred after Ms. Gaines's death. Pls.' Jolly Depo. at 2, 17-18; Pls.' Lloyd Depo. at 55-56.[11]

---

[10] Plaintiffs also rely, at least indirectly, on their retained expert, Dr. Lyman's, opinion that Mr. Lloyd's field training and driving history contained "red flags" which "collectively should have caused police administrators to retrain if not terminate Lloyd from his position as a police officer." Lyman Report at 7. The Court previously ruled that most of Dr. Lyman's proposed opinions and testimony are inadmissible. *See* 12/27/2024 Order [Doc. No. 141] at 12. However, the Court concluded that it would "allow Dr. Lyman to offer testimony regarding Mr. Lloyd's FTO records and why certain entries should have represented 'red flags' to the City." *Id.* Even so, Dr. Lyman's opinion regarding "red flags" does little for Plaintiffs. Mr. Lloyd's field training records and on-duty driving history contain minor infractions or incidents, such as an improper right turn or a low-speed fender bender. Perhaps those infractions or incidents should have constituted "red flags" regarding Mr. Lloyd's ability to complete those specific, rather routine skills, but, for the reasons explained above, it cannot be said that they should have constituted "red flags" indicating that Mr. Lloyd would engage in the egregious actions of December 14, 2019.

[11] Plaintiffs' framing makes it sound as if MPD officers were free at any time to access their disciplinary file and remove past records, with no supervision whatsoever. As made clear by Ms.

### 3.    The City's Disciplinary Matrix

Plaintiffs also take issue with the City's Disciplinary Matrix, which allegedly allowed officers to commit numerous speeding offenses, or get in numerous accidents, during a one-year or two-year period before any disciplinary action was taken by the City. *See* Pls.' Resp. at 27; *see also* Pls.' UMF 18-22. In its order on the City's *Daubert* motion, the Court thoroughly explained how this hypothetical, worst-case-scenario application of the Disciplinary Matrix would not help the jury understand the evidence or determine a fact issue in this case. *See* 12/27/2024 Order at 17. For similar reasons, Plaintiffs' reliance here does nothing to move the needle. There is no evidence that the City ever applied the Disciplinary Matrix in Plaintiffs' worst-case-scenario fashion—either as to Mr. Lloyd or any other officer. Here, too, Plaintiffs' proffered evidence regarding the Disciplinary Matrix does not tend to show that it was highly predictable or plainly obvious that the City's failure to supervise or discipline Mr. Lloyd would lead to a violation of constitutional rights.[12]

### B.    Even assuming that the City acted with deliberate indifference, Plaintiffs fail to establish causation.

"A plaintiff can establish a direct causal link by showing that the municipal practice was closely related to the deprivation of rights. To do so, the plaintiff must prove that the

---

Jolly's deposition testimony, that was not the case. *See* Pls.' Jolly Depo. at 5-6. Officers were required to make a request with Ms. Jolly, who then ensured certain requirements were met before she removed the record. *Id.*

[12] Because the Court previously ruled that Dr. Lyman's opinions and testimony regarding the Disciplinary Matrix are inadmissible, it did not consider them for purposes of this Order. *See* 12/27/2024 Order at 17-20. Even if it had, the Court would have still reached the same conclusion.

municipality was the 'moving force' behind the alleged injury." *Arnold*, 35 F.4th at 795 (quoting *Schneider*, 717 F.3d at 770). The Court "must rigorously scrutinize the causation element when the municipal policy is not itself unconstitutional to ensure that the municipality is not held liable solely for its employees' actions." *Id.*; *see City of Okla. City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985) ("The fact that a municipal policy might lead to police misconduct is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the moving force behind a constitutional violation."). "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Schneider*, 717 F.3d at 770 (quoting Martin A. Schwartz, *Section 1983 Litigation Claims & Defenses*, § 7.12 (2013)).

The City argues that "the cause of Ms. Gaines' tragic passing was the individual, 'irrational,' and illegal decisions implemented by Lloyd, and by Lloyd alone." City Mot. Summ. J. at 19. In support, the City relies on the purported non-emergency nature of Officer Wagner's request for Mr. Lloyd to bring him the spare keys, along with Mr. Lloyd's alleged knowledge that he was required to observe all traffic laws when responding to such non-emergency situations. *Id.* Despite that, the City maintains that Mr. Lloyd made an "irrational decision" to speed through the intersection, in direct contravention of City policy and training. *See id.* at 19-20.

Plaintiffs, on the other hand, do not directly address the causation element. They argue that "the City's policies, training and supervision of Lloyd [were] the moving force behind his decision to recklessly speed on December 14, 2019," but it is unclear from the

Response what specific evidentiary material Plaintiffs rely on to support their position. *See* Pls.' Resp. at 30.

Here, Plaintiffs must present sufficient evidence that the City "set in motion a series of events that [it] knew or reasonably should have known would cause others to deprive [Ms. Gaines] of [her] constitutional rights." *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012). Mr. Lloyd was off-duty at the time of the accident, and he knew that, even if on-duty, he was required to observe all traffic laws when responding to a non-emergency situation. It is thus unclear how any sort of supervision—absent the City imposing some sort of supervision of off-duty officers driving their personal vehicles—would have impacted the events of December 14, 2019. *See Schneider*, 717 F.3d at 779 ("Ms. Schneider has not pointed to any particular action the sergeant would have taken. Nor has she shown how any particular action on the sergeant's part would have prevented his attack on Ms. Schneider.").

Mr. Lloyd's irrational decision-making on December 14, 2019 was the driving force behind the violation of Ms. Gaines's constitutional rights, and Plaintiffs fail to present sufficient evidence supporting any other conclusion. "Mere speculation that something would have been done to prevent [Ms. Gaines's death] is not sufficient to establish causation." *Id.* at 780. Therefore, even if the City had acted with deliberate indifference, Plaintiffs fail to present sufficient evidence showing the City's action or inaction was the moving force behind the deprivation of Ms. Gaines's constitutional rights.

**II.    The City is not entitled to summary judgment on Plaintiffs' GTCA claim.**

Section 153(A) of the GTCA provides that "a political subdivision shall not be liable under the provisions of [the GTCA] for any act or omission of an employee acting outside the scope of the employee's employment." Okla. Stat. tit. 51, § 153(A). And § 152(12) defines "scope of employment" as "performance by an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority including the operation or use of an agency vehicle or equipment with actual or implied consent of the supervisor of the employee . . . ." Okla. Stat. tit. 51, § 152(12). Boiled down, if Mr. Lloyd was acting outside the scope of employment at the time of the accident resulting in the death of Ms. Gaines, the City cannot be found liable under the GTCA.

The City argues Mr. Lloyd's conduct at the time of the accident was malicious and in a willful and wanton manner, thus taking him outside of the scope of employment. City Mot. Summ. J. at 22. The City relies on Mr. Lloyd's purported knowledge of relevant City policies and training quizzes which, according to the City, "indicate Lloyd knew he was required to obey all traffic laws while responding to a non-emergent situation." *Id.* at 23. Further, the City contends Mr. Lloyd pleading guilty to first degree manslaughter—which "requires the act to be committed while unlawfully engaged in a misdemeanor"—supports the conclusion that his conduct at the time of the accident was careless, wanton, and without regard for the safety of others. City Reply at 9. The underlying misdemeanor forming the basis of Mr. Lloyd's manslaughter charge was reckless driving, which is defined as driving

a motor vehicle "in a careless or wanton manner without [] regard for the safety of persons[.]" *Id.* (quoting Okla. Stat. tit. 47, § 11-901(A)).

In response, Plaintiffs and Mr. Lloyd argue that Mr. Lloyd was acting within the scope of employment. For their part, Plaintiffs contend "whether an employee acted in such a manner as to take him outside the scope of employment is a question which must be determined by the trier of fact on a case-by-case basis." Pls.' Resp. at 31. Here, Plaintiffs continue, "[a] jury could reasonably conclude that Lloyd, despite driving recklessly, acted within the scope of his employment without finding he acted with malice or in a willful or wanton manner . . . ." *Id.* Along the same lines, Mr. Lloyd argues that "[b]ut for his employment, [Mr. Lloyd] would not have been involved that date and the accident would not have happened." Lloyd Resp. at 10.[13]

In this case, the facts cut both ways. The City's Shop With a Cop event was organized and sanctioned by MPD. Although Mr. Lloyd was not directly participating in the event, he testified that "it's pretty much accepted that at any given point, you're not really off duty" and agreed that if his "agency or the public needs" him, he is a "police officer 24 hours a day." Pls.' Lloyd Depo. at 69, 71. Further, Mr. Lloyd reaffirmed his belief that he was "acting within the course and scope of his employment at all times material to the occurrence of the accident." *Id.* at 6. And although Mr. Lloyd was not on-duty or driving an MPD vehicle at the time of the accident, he was responding to a call from Officer

---

[13] Plaintiffs "agree with and adopt the factual disputes, assertions, and arguments of Defendant Lloyd in his response to the City's claim that Lloyd was not in [the] scope of his employment." Pls.' Resp. at 32.

Wagner, who was participating in official MPD business and needed the spare key to Mr. Lloyd's MPD-issued patrol vehicle.

"Whether a police officer's actions were taken within the scope of employment is a jury question unless only one reasonable conclusion can be drawn from the facts alleged." *Tuffy's, Inc. v. City of Okla. City*, 212 P.3d 1158, 1167 (Okla. 2009). Here, based on the facts discussed above, a jury could reasonably conclude that Mr. Lloyd was acting within the scope of employment at the time of the accident. *See DeCorte v. Robinson*, 969 P.2d 358, 362 (Okla. 1998) (concluding that jury could have reasonably found that off-duty police officer was—at least initially—acting within the scope of employment when he engaged the plaintiff in a traffic stop, helped in arresting the plaintiff, and later struck the plaintiff after he was detained). Therefore, the City is not entitled to summary judgment on Plaintiffs' GTCA claim.[14]

## CONCLUSION

For these reasons, the Court finds that the City is entitled to summary judgment on Plaintiffs' § 1983 municipal-liability claim. However, the City has not shown that it is entitled to summary judgment on Plaintiffs' state-law claim under the GTCA.

---

[14] As it relates to Plaintiffs' § 1983 claim against Mr. Lloyd, they will be required to prove that Mr. Lloyd acted under the color of law. However, the jury's determination as to whether Mr. Lloyd was acting within the scope of employment under the GTCA is irrelevant to its determination of whether Mr. Lloyd was acting under color of law for § 1983 purposes. *See Brown v. Gray*, 227 F.3d 1278, 1290 (10th Cir. 2000) ("First, the fact that the jury found Officer Gray was not acting in the scope of his employment is of no consequence to Mr. Brown's section 1983 action. The scope of employment inquiry was related to the district court's interpretation of the Colorado statutes, and this standard is not a part of the section 1983 claim."); *see also Mayfield v. City of Edmond*, No. CIV–08–0825–HE, 2008 WL 4914159, at *1 (W.D. Okla. Nov. 13, 2008) ("A police officer may act both under the color of law and outside the scope of his or her employment, resulting in liability under both § 1983 and state tort statutes.").

**IT IS THEREFORE ORDERED** that the City's Motion for Summary Judgment [Doc. No. 131] is **GRANTED IN PART** and **DENIED IN PART**, as set forth herein. The City is entitled to summary judgment on Plaintiffs' § 1983 municipal-liability claim, but Plaintiffs' claim against the City under the GTCA, as well as their claims against Mr. Lloyd, remain for trial.

**IT IS SO ORDERED** this 3rd day of March, 2025.

_____
TIMOTHY D. DeGIUSTI
Chief United States District Judge